**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **FBRG HOSPITALITY DEVELOPERS, LP,**<br><br>*Plaintiff,*<br><br>**V.**<br><br>**REAGAN NATIONAL ADVERTISING OF AUSTIN, INC.,**<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CASE NO. 1:25-cv-01154** |

**DEFENDANTS' COUNTERCLAIM**

TO THE HONORABLE U.S. DISTRICT COURT:

Defendant/Counter-Plaintiff Reagan National Advertising of Austin, LLC (formerly known as Reagan National Advertising of Austin, Inc., hereinafter "Defendant," "Counter-Plaintiff" and/or "Reagan") files this Counterclaim against Counter-Defendant FBRG Hospitality Developers, LP ("Counter-Defendant" and/or "FBRG") and would show as follows:

1. This Counterclaim is filed within 21 days of Defendant having filed its general denial in the state court action and having removed this case to Federal Court.

2. This Counterclaim is part of the same case or controversy as the underlying claim brought by Plaintiff.

## I. FACTUAL BACKGROUND

3. On or about June 23, 2017, Reagan entered into an Easement Agreement with Barons Creek II, LLC giving Reagan the right to maintain and operate a billboard on the property currently owned by Plaintiff. The Easement was filed in the real property records of Gillespie County putting all persons on notice of Reagan's Easement rights. A copy of the Easement Agreement is attached hereto as **Exhibit "A"**.

4. Reagan has timely made all payments required by the Easement Agreement.

5. Reagan has directed all such payments to Barons Creek II, LLC as required by the Easement Agreement, and was never been informed by anyone at any time that the payments should be directed to anyone else or any successors or assigns.

6. Reagan stands willing and able to make any future payments as it may be directed to make.

7. No one ever provided Reagan the required written notice of any alleged payment default nor given Reagan its 30 days' notice to correct the same as provided for by the Easement Agreement.

8. Reagan has long carefully maintained its billboard structure and installed advertising space on its billboard and generated income from the advertising thereon.

9. Reagan inspects the billboard every time new advertising copy is placed on it, and takes a picture of the billboard every time new advertising copy is placed on it.

10. The billboard has at all times been wholly maintained and at the time of its destruction was in a perfect and safe condition.

11. Unbeknownst to Reagan, the property on which its Easement is located was sold. Reagan was never informed of the sale. The current owners have undertaken to redevelop the property for commercial purposes.

12. On or about June 9, 2025, when Reagan's sign installation workers went to change the advertising copy on the billboard to place a new advertisement on it, they discovered that the billboard had been demolished and was simply no longer there.

13. When the installers informed Reagan that the sign was gone, Reagan had its director of Real Estate, Chris Iversen, go to the construction site. There he met Arthur

Chiaverini, a Senior Superintendent of Satterfield & Pontikes Construction, Inc., who told Mr. Iversen that they had removed the sign and who stated that, "I'm surprised it took you this long to figure it out."

14. Mr. Iversen then sent an email that same day to Nate Berkowitz, a Senior Developer of the property, informing Mr. Berkowitz of Reagan's easement rights and of Reagan's intention to rebuild its sign and seek damages for the sign's destruction. A copy of that email is attached as **Exhibit "B"**.

15. Hearing no further response, Reagan sent a demand letter through its counsel demanding that Reagan be allowed to replace its sign. A copy of that letter is attached as **Exhibit "C"**.

16. FBRG, rather than cooperating with Reagan to allow it to replace its sign on the property pursuant to its Easement rights, instead filed a lawsuit in state district court asserting untrue facts and making wholly specious claims about the condition of the billboard and the ongoing validity of Reagan's Easement.

17. FBRG has wholly breached its obligations as provided for in the Easement Agreement.

18. Accordingly, Reagan hereby brings this Counterclaim against FBRG alleging the following causes of action.

## II. CAUSES OF ACTION

### A. Texas Theft Liability Act

19. Reagan incorporates the above paragraphs herein by reference.

20. Reagan hereby brings suit pursuant to the provisions of the Texas Theft Liability Act at TEX. CIV. PRAC. & REM. CODE Sec. 134.001 et. seq.

21. FBRG committed a theft as defined by the statute by unlawfully appropriating Reagan's property. Such act by FBRG was done purposefully, intentionally, and with malice.

22. Accordingly, Reagan is entitled to its actual damages resulting from FBRG's theft, including the cost to replace its billboard, lost business income, attorneys' fees and punitive damages for which it now sues.

**B. Breach of Easement Agreement**

23. Reagan incorporates the above paragraphs herein by reference.

24. Reagan hereby brings suit complaining of FBRG's breach of the Easement Agreement at issue in this case.

25. FBRG is bound by all the terms and conditions of the Easement Agreement attached hereto as **Exhibit "A"**. This Easement Agreement was on file in the real property records of Gillespie County, and FBRG became fully bound by all of the terms and conditions of the Easement Agreement when it purchased the property burdened by the Easement.

26. The Easement Agreement contained specific covenants that expressly prohibited FBRG from "removing, dismantling, raising, or lowering, either temporarily or permanently, the Sign at any time." FBRG knowingly and intentionally violated this covenant contained in the Easement Agreement when it destroyed and removed Reagan's sign without cause or notice.

27. Further, the Easement Agreement contains other covenants and prohibitions against certain development activities on the Easement property and prohibitions against blocking or interfering with Reagan's sign structure and the visibility of the same. To the extent that discovery in this case reveals that FBRG's development plans seek to violate these covenants, Reagan hereby brings suit for such further ongoing or anticipated breaches by FBRG of the Easement Agreement.

28. Accordingly, Reagan sues for its actual damages resulting from FBRG's breach, anticipatory breach, and for specific performance to enforce all terms and conditions contained in the Easement Agreement. Reagan asks the Court to enter Judgment to enforce the Easement Agreement and to allow Reagan to replace the sign structure improperly removed by FBRG.

**C. Suit for Preliminary and Permanent Injunctive Relief**

29. Reagan incorporates the above paragraphs herein by reference.

30. Reagan hereby brings suit seeking a preliminary and permanent injunction to enjoin FBRG from taking any further action to violate Reagan's rights or the covenants contained in the Easement Agreement.

31. Pursuant to Paragraph 7 of the Easement Agreement, it provides that no bond should be required if injunctive relief is sought and no bond should be required in this case.

32. Reagan seeks a preliminary and permanent injunction against FBRG to prohibit it from taking any action whatsoever to prevent or interfere with Reagan's reconstruction, replacement, and operation of its billboard sign on its Easement.

33. Reagan further seeks a preliminary and permanent injunction to enjoin FBRG from taking any act by it, or through any agent acting on its behalf, to violate the Covenants to Grantor contained in the Easement Agreement. The Easement Agreement contains specific covenants running with the Land that it appears FBRG is in the process of violating or that it intends to violate. Specifically Reagan asks the Court to enjoin FBRG from:

a. Installing or constructing buildings, fences, signs or any other structures that obstruct or impair the visibility to the Sign from U. S. Highway No. 290;

b. Planting, or allowing the growth of, trees, shrubs or other vegetation which would obstruct, or be likely to over time grow to a height that would obstruct or impair, the visibility of the Sign from the Highway or obstruct or impair access thereto from a public street;

c. Seeking to change zoning which would prohibit or impose restrictions on outdoor advertising on the Property;

d. Contesting any variances, petitions or application sought by Reagan relating to the use of the property for outdoor advertising;

e. Parking cars or allowing cars to be parked in such a way as to obstruct or impair access to the Sign for maintenance, servicing, replacement or repair;

f. Storing any items on the property or allowing the accumulation of garbage on the Property such that accessibility to any of the Signs is obstructed or impaired;

g. Erecting any other signs, or improvements on the Property which obstruct or impair the use, effectiveness, lighting, access to or visibility of the Sign from the Highway or obstruct or impair access thereto, or erecting any other sign on the Property which advertise off premises activities, whether or not such other signs obstruct or impair the visibility of the Sign; and

h. Terminating, removing, dismantling, or interfering, disrupting, or in any way denying electric power to the Sign.

34. In short, Reagan seeks both a preliminary and permanent injunction enjoining FBRG from undertaking any acts which would result in a violation of the Covenants contained in the Easement Agreement and from taking any acts to affect Reagan's operation or maintenance of its sign.

35. Further, Reagan seeks both a preliminary and permanent injunction enjoining FBRG from seeking to prevent Reagan from replacing the sign FBRG removed and destroyed on Reagan's Easement property.

36. Reagan will be imminently and irreparably injured if an injunction is not issued and its damage cannot be fully rectified by a final judgment. Specifically, Reagan's right to enforce its real property easement rights and the covenants contained therein are unique to the property where its sign was located. FBRG's development activities affecting the sign cannot be undone if allowed to proceed in violation of the covenants contained in the Reagan real property easement. As such, there is no adequate remedy at law if an injunction is not issued to preserve Reagan's Easement rights.

37. Reagan has a substantial likelihood of success in this case as reflected by its easement affixed hereto as Exhibit "A" which is on file in the real property records of Gillispie County. This Easement Agreement gives Reagan the absolute right to maintain a billboard on the property burdened by the easement. Reagan has at all times maintained its billboard in excellent condition, it has made all payments as required by the Easement Agreement, and was never provided any notice of any alleged default of any sort as required by the Easement Agreement before FBRG wrongfully destroyed Reagan's billboard structure. Reagan is clearly entitled to specific performance to reconstruct its sign and recover damages under the Texas Theft Liability Act and under the common law for FBRG's breach of the Easement Agreement.

38. The injury Reagan faces outweighs the injury that would be sustained by FBRG if injunctive relief is entered because on information and belief and based upon project renderings publicly posted by FBRG, the Reagan billboard structure in no way impedes FBRG's

development and is not situated in a location where any structures are being built as part of FBRG's development.

39. The injunctive relief sought by Reagan in no way whatsoever would adversely affect any public policy or the public interest as Reagan had properly obtained the required governmental permits for its billboard structure before it was demolished by FBRG, and had long maintained the same placing therein both commercial advertising and public service announcements.

## III. CONDITIONS PRECEDENT

40. All conditions precedent for prosecuting all causes of action and seeking all remedies as alleged in this counterclaim have been performed, have occurred, or have been waived.

## IV. ATTORNEYS' FEES AND INTEREST

41. Reagan is entitled to recover reasonable and necessary attorneys' fees that are equitable and just under Chapters, 38 and/or 134 of the Texas Civil Practice & Remedies Code.

## V. CONCLUSION AND PRAYER

For these reasons, Reagan National Advertising of Austin, LLC, f/k/a Reagan National Advertising of Austin, Inc., respectfully requests that Plaintiff/Counter-Defendant take notice by this suit and bear all costs therefrom, that judgment be entered for Reagan National Advertising of Austin, LLC, and that it receives such other and further relied, in law or equity, to which he may be entitled.

In addition, Reagan National Advertising of Austin, Inc. respectfully requests that upon final hearing, the Court award Reagan:

1. all money damages to which it can show itself justly entitled;

2. specific performance as described hereinabove;

3. statutory, punitive and/or exemplary damages as allowed by law;

4. preliminary and permanent injunctive relief described hereinabove;

5. its attorneys' fees and expenses;

6. its court costs;

7. prejudgment and post-judgment interest as allowed by law; and

8. such other relief, general or special, in law or in equity, which the Court believes Reagan is rightfully entitled.

Respectfully submitted,

SAVRICK, SCHUMANN, JOHNSON, MCGARR,
KAMINSKI & SHIRLEY, L.L.P.

By:______________________________
Gary N. Schumann
State Bar No. 17851930
Mitchell D. Savrick
State Bar No. 17692200
The Overlook at Gaines Ranch
4330 Gaines Ranch Loop, Suite 150
Austin, Texas 78735
Phone: (512) 347-1604
Fax: (512) 347-1676
gary@ssjmlaw.com
mitchell@ssjmlaw.com

**ATTORNEYS FOR DEFENDANT / COUNTER-PLAINTIFF REAGAN NATIONAL ADVERTISING OF AUSTIN, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record as set forth below in compliance with the Federal Rules of Civil Procedure on this 25th day of July, 2025.

Dan Bitting *dbitting@fbfk.law*
Steven Darling *sdarling@fbfk.law*
FERGUSON, BRASWELL, FRASER, KUBASTA, PC
2500 Dallas Parkway, Suite 600
Plano, Texas 75093

**ATTORNEYS FOR PLAINTIFF**

Gary N. Schumann

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **FBRG HOSPITALITY DEVELOPERS, LP,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **V.** | § | **CASE NO. 1:25-cv-01154** |
| | § | |
| **REAGAN NATIONAL ADVERTISING OF AUSTIN, INC.,** | § | |
| | § | |
| | § | |
| ***Defendant.*** | § | |

## DECLARATION

I, Chris Iversen, pursuant to C.P.R.C. § 132.001, declare as follows:

"My name is Chris Iversen, and I am the Director of Real Estate for Reagan National Advertising of Austin, LLC (formerly known as Reagan National Advertising of Austin, Inc.). I am over the age of 21 years and my address in my representative capacity is 7301 Burleson Road, Austin, Texas 78744.

"I am duly qualified and authorized in all respects to make this declaration. I have read the factual statements made in Reagan National Advertising of Austin, LLC's Counterclaim, verify that the facts stated therein are within my personal knowledge, and declare under penalty of perjury that they are true and correct."

Executed in Travis County, State of Texas, on the 24 day of July, 2025.

[signature]
Chris Iversen

217-246

17 PGS 20173234
EA

# EASEMENT AGREEMENT

This Easement Agreement (this "Agreement") is made and entered into this 26 day of June, 2017, by and between BARONS CREEK II, LLC, whose address is 1221 Lamar, Suite 1136, Houston, Texas 77010 ("Grantor"), and REAGAN NATIONAL ADVERTISING OF AUSTIN, INC., whose address is 7301 Burleson Road, Austin, TX 78744 ("Grantee").

## RECITALS

A. Grantor is the owner of certain property located in the City of Fredericksburg, Gillespie County, Texas, and more particularly described and depicted on Exhibit "A" attached hereto (the "Property").

B. Grantee is the owner of an outdoor advertising sign and all supporting structures, devices, connections, appurtenances and replacements, rights of use, conforming rights, non-conforming rights, registrations, applications, permits, grand-fathering and other rights related thereto (collectively the "Sign") located on the Property as shown on Exhibit "A".

C. Grantor desires to grant Grantee an easement for outdoor advertising and wireless communication purposes, including but not limited to the continued location and operation of the Sign on the Property in accordance with the terms of this Agreement.

## TERMS OF AGREEMENT

For the sum of ten dollars and other valuable consideration, the receipt of which is hereby acknowledged, Grantor and Grantee agree as follows:

1. Grant of Easement. Grantor hereby grants to Grantee an exclusive easement on the Property in the area shown on Exhibit "B", being the area in which the Sign is currently located plus a forty foot (40') wide strip of land running from U.S. Highway 290 in a northeasterly direction to forty feet (40') past the location of the Sign (the "Easement Area"), for





EXHIBIT A

the sole purpose of owning, operating, maintaining, servicing, repairing, and replacing its outdoor advertising sign (whether digital, electronic or print media) and wireless communication devices. For purposes of this Easement, the term "Sign" includes the supporting structures, connections and electric wiring necessary to operate the Sign. Grantor also hereby grants to Grantee access over, through and on the Property, to the extent reasonably necessary, for access to the Sign for construction, maintenance and removal. Grantor agrees that it will not obstruct Grantee's access to the Sign from a public street. Grantor also grants to Grantee the right to construct and maintain utility services that are necessary for the illumination or operation of the Sign.

2. Covenants of Grantor. Subject to Paragraph 4 below, Grantor irrevocably covenants to allow the continued operation of the Sign and agrees not to take any actions which would reduce or curtail the effectiveness of the use of the Property for outdoor advertising purposes, including without limitation the following:

(a) Installing or constructing buildings, fences, signs or any other structures that obstruct or impair the visibility to the Sign from U.S. Highway No. 290 (as it may hereafter be named or configured, the "Highway");

(b) Planting, or allowing the growth of, trees, shrubs or other vegetation which would obstruct, or be likely to over time grow to a height that would obstruct or impair, the visibility of the Sign from the Highway or obstruct or impair access thereto from a public street;

(c) Seeking to change zoning which would prohibit or impose restrictions on outdoor advertising on the Property;





EXHIBIT A

(d) Contesting any variances, petitions or applications sought by Grantee relating to the use of the Property for outdoor advertising;

(e) Parking cars or allowing cars to be parked in such a way as to obstruct or impair access to the Sign for maintenance, servicing, replacement or repair;

(f) Storing any items on the property or allowing the accumulation of garbage on the Property such that accessibility to any of the Signs is obstructed or impaired;

(g) Erecting any other signs, or improvements on the Property which obstruct or impair the use, effectiveness, lighting, access to or visibility of the Sign from the Highway or obstruct or impair access thereto, or erecting any other signs on the Property which advertise off premises activities, whether or not such other signs obstruct or impair the visibility of the Sign;

(h) Taking any action which impedes Grantee's ability to exercise any rights granted to Grantee herein; including but not limited to building or making modifications or renovations to buildings that interfere with the operation, use, effectiveness, communications, access to or visibility of the Sign for outdoor advertising purposes;

(i) Removing, dismantling, raising, or lowering, either temporarily or permanently, the Sign at any time; and

(j) Terminating, removing, dismantling, interfering, disrupting, or in any way denying electric power to the Sign, provided however, Grantee acknowledges that interruption of power caused by force majeure shall not violate this Section. Acts caused by contractors and/or subcontractors of Grantor shall not be deemed force majeure.

3. Grantee's Right to Remove Obstructions. Grantor hereby grants unto Grantee the right to remove any obstructions on the Property that are placed on the Property in violation of

the terms of this Agreement, including without limitation the right to trim and remove trees, and to take such other actions as necessary to be able to operate, maintain, repair, replace and service the Sign.

4. Term. The easements granted pursuant to this Agreement and the covenants of Grantor and all other terms hereof shall run perpetually. Grantee may terminate this Agreement at any time by giving Grantor thirty (30) days written notice. Grantee may remove any of the Sign's minor and major components from the Easement Area at any time either before or after termination of this Agreement.

5. Condemnation. In the event all or any part of the Easement Area (including any access thereto) is condemned or sought to be condemned, Grantee shall be entitled, in its sole discretion, to one or more of the following: a) to contest the condemnation; b) to relocate the Sign onto portions of the Property not acquired in areas that would not materially interfere with Grantor's use of improvements; c) to terminate this Agreement; and d) to receive compensation from the condemnor for the value of Grantee's interest in the Easement Area and Sign acquired and for the reduced value of Grantee's interest in the Easement Area not acquired which results from the acquisition. "Condemned" and "condemnation" shall be construed to include any transfer of possession, title or right relating to the Easement Area, or any portion thereof, in favor of or for the benefit of any entity having the power of eminent domain, including, but not limited to, sale or lease. No right of termination set forth anywhere in this Agreement may be exercised by or for the benefit of any entity having the power of eminent domain. Any relocation under this paragraph shall be at Grantee's sole cost and expense.

6. Casualty. In the event the Sign is partially or totally destroyed or damaged by casualty, including without limitation, fire, flood, or other natural disaster, Grantee shall have the



EXHIBIT A

right at Grantee's election to rebuild and relocate, if applicable, the Sign to an area on the Property that does not materially interfere with the use of any improvements on the Property. Such relocation shall be made at Grantee's sole cost and expense.

7. Successors and Assigns. This Agreement, including but not limited to the covenants of Grantor set forth in Section 2 above, shall constitute a covenant running with the land and shall be binding upon Grantor and its successors and assigns in the Property, or any portion thereof, and the provisions hereof shall be specifically enforceable against Grantor and Grantee and their respective successors and assigns, regardless of whether such parties have actual notice of the provisions hereof. Without limiting the foregoing, each of Grantee and Grantor shall have all remedies available at law or in equity to enforce this Agreement, including suits for damages and/or specific performance. In the event such party seeks an injunction based upon the other party's breach, it is specifically agreed that no bond shall be required.

8. Assignment by Grantee. Grantor agrees that Grantee may transfer, sell or assign its rights under this Agreement to any person whomsoever.

9. Tax Payments by Grantee. Grantor also grants unto Grantee the right to pay any taxes relating to the Property in order to prevent a tax sale or to make any payments to prevent the foreclosure of any liens or encumbrances against the Property or to redeem the Property from same. In the event of payment of such taxes, liens or redemption by Grantee, Grantee shall be entitled to recover the amount of such taxes and other payments from Grantor, together with interest thereon at the lower interest rate of either twelve percent (12%) or the maximum rate allowed by law from the time of payment by Grantee until repayment thereof by Grantor. In the event Grantee prevents a foreclosure action or sale to satisfy liens or encumbrances on the Property by any lien payment described above, or redeems the Property therefrom, Grantee shall

succeed to all of the rights and interest of the original lienholder. Grantee shall have the same rights as the original lienholder to initiate a foreclosure of the Property to recover those payments made, to include Grantee's costs, expenses, fees and attorneys' fees. The remedies afforded by this Section 10 shall not be exclusive and shall be in addition to any and all other remedies available to Grantee at law or in equity.

10. Easement Payments. Grantee shall pay to Grantor an annual easement fee for the first thirty (30) years of this Easement in the amount of $1,200.00 per year, paid monthly, quarterly, or annually.

11. Default. Grantee shall not be in default hereunder unless written notice of such default is provided to Grantee and Grantee is given thirty (30) days to cure such default. If such failure cannot reasonably be cured within such thirty (30) day period, the length of such period shall be extended for the period reasonably required therefore if Grantee commences curing such failure within such thirty (30) day period and continues to take action to cure such failure with reasonable diligence and continuity.

12. Termination of Lease. Upon execution and recordation of this Agreement, that certain Lease Agreement dated January 8, 2003 between Bill Ham and Grantee with regard to the Sign shall automatically terminate.

13. Counterparts. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a





EXHIBIT A

single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.

14. Miscellaneous. This Agreement is to be governed by and interpreted under the laws of the State of Texas. If any of the provisions of this Agreement are deemed to be not enforceable, in whole or in part, the remaining provisions shall be enforceable notwithstanding the invalidity of any other provision. Any provision not enforceable in part shall be enforceable to the extent valid and enforceable.

{Signatures on following pages}





EXHIBIT A

DATED the day and year first above written.

GRANTOR:

BARONS CREEK II, LLC,
a Texas limited liability company

By: ______________________________
Dennis E. Murphree,
Manager

STATE OF TEXAS §
§
COUNTY OF HARRIS §

Before me, the undersigned authority, on this day personally appeared DENNIS E. MURPHREE, Manager of BARONS CREEK II, LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in the capacity and for the purposes and consideration therein expressed on behalf of said limited liability company.

Given under my hand and seal of office this 23 day of June, 2017.

DARLENE R. KILBURN
Notary Public, State of Texas
My Commission Expires
August 06, 2019

______________________________
Notary Public - State of Texas



C:\NRPortbl\Interwoven\ABERGER\2531576_2.docx
2531576.2

EXHIBIT A

GRANTEE:

REAGAN NATIONAL ADVERTISING OF AUSTIN, INC.,
a Delaware corporation

By: 
William K. Reagan II, President

STATE OF TEXAS §
§
COUNTY OF TRAVIS §

Before me, the undersigned authority, on this day personally appeared WILLIAM K. REAGAN II, President of REAGAN NATIONAL ADVERTISING OF TEXAS, INC., a Delaware corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in the capacity and for the purposes and consideration therein expressed on behalf of said corporation.

Given under my hand and seal of office this 26th day of June, 2017.

SARAH M. TEETER
MY COMMISSION EXPIRES
October 4, 2018

Notary Public - State of Texas



C:\NRPortbl\Interwoven\ABERGER\2531576_2.docx
2531576.2

EXHIBIT A

**EXHIBIT "A"**

Legal description of land:

TRACT I:
Lot No. 2, Carabetta Subdivion, situated in Fredericksburg, Gillespie County, Texas, according to the map or plat of record in Volume 2, Page 96, Deed Records of Gillespie County, Texas.

TRACT II:
BEING 0.399 acres of land, more or less, situated in the City of Fredericksburg, Gillespie County, Texas, part of Outlot No. 582 as said Outlot is shown on the map of Fredericksburg, Texas, and Environs by the German Emigration Company; said 0.399 acre tract of land is described by metes and bounds on Exhibit "A", attached hereto and made a part hereof.

EXHIBIT "A"

SEARCHERS
LAND SURVEYING, LLC
MASON | FREDERICKSBURG
P.O. Box 528 Mason, TX 76856 | 325-347-7489 | TBPLS Firm #10193966
P.O. Box 1504 Fredericksburg, TX 78624 | 806-252-9810 | TBPLS Firm #10194211
www.searchersls.com

LEGAL DESCRIPTION: Being 0.399 acres of land, out of the J. M. Chapa Survey No. 131, Abstract No. 115 in Gillespie County, Texas, being a portion of Outlot 582 as shown on plat of Fredericksburg, Texas by the German Emigration Company and Environs and being all of that certain 0.399 acre tract described in Volume 242, Page 613 of the Real Property Records of Gillespie County, Texas; Said 0.399 acre tract being more particularly described as follows:

BEGINNING at a 1/2 inch iron rod found in the southwest line of U. S. Highway No. 87 for the northeast corner of Lot 2 of the Carabetta Subdivision as shown on plat recorded in Volume 2, Page 96 of the Plat Records of Gillespie County, Texas and the north corner hereof and from which a concrete monument found in the southwest line of said U. S. Highway No. 87 and the northeast line of said Lot 2 bears North 50°45'27" West a distance of 304.76 feet;

THENCE South 50°45'27" East a distance of 249.25 feet along the southwest line of said U. S. Highway No. 87 to a mag nail set for the northwest corner of that certain 0.003 acre tract described in Volume 80, Page 625 of the Deed Records of Gillespie County, Texas and the northeast corner hereof;

THENCE South 28°47'37" West a distance of 10.19 feet along the west line of said 0.003 acre tract to a mag nail set in the north line of U. S. Highway No. 290 for the southwest corner of said 0.003 acre tract and the southeast corner hereof;





EXHIBIT A

THENCE along a curve turning to the left with an arc length of 250.21 feet, a radius of 1195.92 feet, a chord bears North 81°46'33" West a distance of 249.75 feet to a 1/2 inch iron rod found for southeast corner of said Lot 2 and the southwest corner hereof and from which a concrete monument found in the north line of said U. S. Highway No. 290 and the south line of said Lot 2 bears South 81°10'33" West a distance of 458.37 feet;

THENCE North 24°17'04" East a distance of 143.59 feet along the east line of said Lot 2 to the POINT OF BEGINNING containing 0.399 acres of land, more or less.





EXHIBIT A






2531576.2

EXHIBIT A






2531576.2

EXHIBIT A

**EXHIBIT "B"**

*See Attached*






2531576.2

EXHIBIT A

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Mary Lynn Rusche

Mary Lynn Rusche, County Clerk
Gillespie County, Texas

June 29, 2017 01:53:12 PM

FEE: $80.00 CCHEESEMAN 20173234
ER

EXHIBIT A

**From:** Chris Iversen
**Sent:** Monday, June 9, 2025 6:24 PM
**To:** 'nate@dcpartnersusa.com' <nate@dcpartnersusa.com>
**Subject:** Reagan Billboard removed Hwy 290 & Hwy 87 Fredericksburg, TX

Nate,

I had an installer report back to our office in Austin today that our billboard located on said property had been removed. Upon review of our internal documents we had serviced the sign on 3/20/25.
Therefor the sign was removed sometime between 3/20/25 and today 6/9/25. As a result I drove out to Fredericksburg from Austin this afternoon.

When I went to the job site today 6/9/25 to gather information I talked to Mr. Arthur Chiaverini (Senior Superintendent) about the fact our sign had been removed. I introduced myself and gave him my card
as Director of Real Estate. I explained we had a billboard on the corner and was shocked as to its removal. In my conversation with him he admitted they had removed it and when I asked when
this had happened he did not recall what date they had removed it but did state " I'm surprised it took you this long to figure it out".

Reagan has a recorded (6-29-2017) perpetual easement for its billboard on this property and its perpetual easement was in place when **FBRG Hospitality Developers LP** purchased the property in November of 2021. Reagan's easement was noted
on the Deed under # 9 of the listed exceptions to the Title.

The actions taken to remove Reagan's billboard were unlawful and constituted, among other claims, breach of contract, gross negligence, conversion and tortious interference with contract.

I understand that you may have to forward this to the appropriate people in your organization and I suspect I will have to forward to our Counsel.

To be clear, Reagan seeks to rebuild its structure which was secured under a perpetual easement and to be reimbursed for all lost advertising income since the sign was unlawfully removed
up and to the day it is rebuilt on the property. Also Reagan will seek any and all costs associated with rebuilding its structure.

Please forward to the appropriate person and I look forward to hearing back from them. If we are unable to resolve this to our satisfaction, Reagan will be forced to file suit to recover costs, loss of income,



EXHIBIT B

punitive judgments, all attorney fees and expenses, costs of court, and pre-judgement and post-judgement interest as allowed by law.

Yours truly,

Chris Iversen


Reagan Outdoor Advertising

**Chris Iversen; Director of Real Estate**

7301-Burleson Road
Austin, TX 78744

512-928-5246 (direct)
512-926-7740 (office)
317-557-3464 (cell)

Chris.Iversen@reaganusa.com




EXHIBIT B

Savrick Schumann Johnson McGarr Kaminski & Shirley, LLP

The Overlook at Gaines Ranch
4330 Gaines Ranch Loop, Suite 150
Austin, Texas 78735
Phone: (512) 347-1604
Fax: (512) 347-1676

**Mitchell D. Savrick – Partner**
*mitchell@ssjmlaw.com*

June 13, 2025

***Via Certified Mail, RRR***
***And First Class Mail***

FBRG Hospitality Developers LP
Attn: Roberto Contreras
P. O. Box 25169
Houston, TX 77265

FBRG Hospitality Developers LP
Attn: Roberto Contreras
2425 W. Loop South 7th Floor
Houston, TX 77027

RE: Reagan Billboard Sign in Fredericksburg, Texas, and Easement Agreement dated June 26, 2017 (the "Easement Agreement") recorded in/under Document No. 20173234 Official Public Records of Gilespie County, Texas

Greetings:

This Firm represents Reagan National Advertising of Austin, LLC ("Reagan") in connection with the referenced matter. You should direct any correspondence regarding this matter to me.

Enclosed with this letter is the Easement Agreement granting a permanent easement to Reagan. Amongst other rights, it allows Reagan to maintain a billboard on the property that we understand you currently own and are developing. This Easement Agreement was listed on Exhibit B to the Special Warranty Deed when you purchased the property.

To Reagan's great surprise, on or about June 9, 2025, when its employees went to change the ad copy on the billboard, it learned for the first time that its billboard had been demolished and was removed from its easement without Reagan's consent.

Reagan must be able to go onsite as soon as possible to reconstruct its billboard. Reagan will be ordering the replacement structure in the next few days. Let us know who Reagan should coordinate with to undertake the billboard replacement. Also, please let us know who was



EXHIBIT C

responsible for the billboard's removal, as Reagan will be seeking its costs associated with replacing the billboard as well as lost revenue.

We would also draw your attention to the covenants contained in the attached Easement Agreement which limit certain development on the property and gives Reagan certain rights with regard to the use of the property. It is Reagan's intention to strictly enforce these rights.

Finally, Reagan was unaware and had never been informed that the property had been sold by Barons Creek LLC. Accordingly, Reagan has been sending the payments provided for by the Easement Agreement to Barons Creek. If the current owner of the property is the correct entity to whom the payments should now be paid, please let us know immediately so that Reagan can adjust the information in its accounting system.

Again, please let us know as soon as possible who Reagan should coordinate with to reconstruct its billboard on the site.

Very truly yours,

SAVRICK, SCHUMANN, JOHNSON, MCGARR
KAMINSKI & SHIRLEY, L.L.P.

Mitchell D. Savrick
For the Firm

MDS/gns/5752-461
Enclosure

Cc: Reagan National Advertising of Austin, LLC
Attn: William K. Reagan II

EXHIBIT C